1 | LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
2 | AMNON Z. SIEGEL (State Bar No. 234981)
asiegel@millerbarondess.com
3 | LAUREN R. WRIGHT (State Bar No. 280809)
lwright@millerbarondess.com
4 | MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
5 | Los Angeles, California 90067
Telephone:  (310) 552-4400
6 | Facsimile:  (310) 552-8400

7 | Attorneys for Plaintiff
National Association of African-American
8 | Owned Media

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11

12 | National Association of African-
American Owned Media, a California
13 | limited liability company,

14 |        Plaintiff,

15 |    v.

16 | AT&T, Inc. a Delaware corporation;
AT&T Services, Inc., a Delaware
17 | corporation; AT&T Mobility LLC, a
Delaware corporation; and DirecTV, a
18 | California limited liability company;
and DOES 1 through 10, inclusive.
19

20 |      Defendants.

**CASE NO.**

**COMPLAINT FOR RACIAL
DISCRIMINATION IN
VIOLATION OF 42 U.S.C. § 1981;
AND FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

*(Sidebar, rotated):* MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

1    Plaintiff National Association of African-American Owned Media ("Plaintiff"

2    or "NAAAOM") alleges against Defendants AT&T, Inc., AT&T Services, Inc.,

3    AT&T Mobility LLC (collectively, "AT&T" ), DirecTV, LLC ("DirecTV"), and

4    DOES 1 through 10, inclusive (collectively, "Defendants"), as follows:

## INTRODUCTION

### A.    AT&T and DirecTV

7    1.    African Americans comprise 13% of the U.S. population and represent

8    more than $1 trillion in consumer spending power.  AT&T is one of the largest

9    companies in the world and is about to quadruple the size of its pay television

10   business through its $67 billion (with assumption of debt) acquisition of DirecTV.

11   DirecTV is the second-largest video programming service in the country.  Both

12   profit greatly by providing television service to African Americans.

13   2.    Despite the foregoing, 100% African American–owned media has been

14   substantially shut out by AT&T and DirecTV.  Of the approximately $4 billion in

15   fees that AT&T pays to license video programming via channel carriage

16   agreements[1] for white-owned channels each year, zero dollars are paid to 100%

17   African American–owned media.  Further, of the additional approximately $4

18   billion AT&T spends each year on advertising, 100% African American–owned

19   media receives less than $1.5 million per year.

20   3.    DirecTV—with four times more pay-tv subscribers than AT&T—

21   spends approximately $12 billion annually for channel carriage, but like AT&T,

22   none of that $12 billion is paid for channel carriage from 100% African American–

23   owned media.  And again, of the additional approximately $2 billion DirecTV

---

[1] A carriage agreement is a contract between a multichannel video programming
distributor, such as AT&T or DirecTV, and a video programming vendor, such as
the Company, granting the distributor the right to "carry" (that is, distribute) the
programmer's content.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

spends on advertising annually, 100% African American-owned media receives less than $1.5 million per year.

4.     For AT&T and DirecTV, it is a one-way street.  While these companies take billions from the African American community, they pay 100% African American–owned media very little or nothing.

5.     Senior AT&T executives have acknowledged that AT&T and DirecTV have (in their words) "a Black problem," which makes them "vulnerable" with governmental regulators in Washington, D.C. who will eventually decide the fate of this acquisition.  But AT&T and DirecTV still refuse to pay for channels owned by, and refuse to advertise with, 100% African American–owned media.

6.     AT&T is proposing to acquire DirecTV to significantly expand its video programming distribution to American consumers.  This acquisition will dramatically increase AT&T's market share in the pay-television sector, making it the largest pay-television operator in the country.  The acquisition is part of a growing national trend of media consolidation that will further concentrate racial discrimination in contracting against 100% African American-owned media and eliminate diverse voices, contrary to the public interest.

7.     White-owned media has deceptively worked hand-in-hand with governmental regulators to perpetrate the exclusion of 100% African American-owned media from being paid for channel carriage.  This has been done through, among other things, the use of "tokens" and "window dressing"—African American celebrities posing as "fronts" or "owners" of channels, which are truly owned by white-owned media, and by way of ineffectual, sham "diversity agreements" with non-media groups and individuals.

8.     Moreover, AT&T has made cash donations to non-media civil rights groups to "buy" their support, effectively paying them off for their approval of AT&T's acquisition of DirecTV.  This is yet another tactic to divert attention away from AT&T/DirecTV's self-admitted "Black problem."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**B.    NAAAOM/The Company**

9.    The Plaintiff herein—NAAAOM—was created and is working to obtain for 100% African American–owned media the same contracting opportunities as their white counterparts for distribution, channel carriage, channel positioning and advertising dollars.  Its mission is to secure the economic inclusion of 100% African American–owned media and obtain equality in contracting with white media.

10.    Historically, because of the lack of distribution/advertising support and economic inclusion, 100% African American-owned media has been forced to either (i) give away significant equity in their enterprises; (ii) pay exorbitant sums for carriage, effectively bankrupting them; or (iii) go out of business, all pushing 100% African American-owned media to the edge of extinction.

11.    In this action, NAAAOM represents—and is the assignee of litigation claims for—at least one 100% African American–owned television production and distribution company (the "Company").  The Company is the only 100% African American-owned video programming producer and multi-channel operator/owner in the United States.

12.    The Company owns seven original content, high definition television networks (channels), six of which were launched to the public in 2009 and one in 2012, and it produces, owns and distributes over 32 television series, with thousands of hours of video programming in its library.  Several of the Company's shows have been nominated for, and even won, Emmy awards.

**C.    Racial Discrimination—Channel Carriage**

13.    In their contracting policies and practices, AT&T and DirecTV have discriminated, and are discriminating, against the Company on account of race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

14.    Starting in approximately 2007, the Company has attempted to contract with AT&T to license and distribute its suite of networks, to no avail.  In fact, for

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  almost two years, the top programming official at AT&T, Aaron Slater, has refused

2  even to meet with this 100% African American–owned media company.

3      15.    The Company has also attempted to contract with DirecTV without

4  success.  For several years, the Company has asked DirecTV to consider a carriage

5  agreement for its networks—or even for a single network—but DirecTV has

6  refused, demanding the exorbitant amount of $20 million annually, which it knows

7  the Company does not have and cannot afford to pay.

8      16.    AT&T and DirecTV refuse to pay the Company a single cent in

9  channel carriage license fees, though they spend approximately $16 billion annually

10 to license channels owned by white-owned media companies.

11     17.    A review of AT&T and DirecTV's contracts and related

12 correspondence and documentation with video programming vendors through

13 discovery in this action will confirm a blatant and consistent pattern of racial

14 discrimination in contracting:  AT&T and DirecTV, collectively, pay white-owned

15 media companies approximately $16 billion in annual channel carriage license fees;

16 but they pay zero dollars to 100% African American–owned media companies.

17     18.    None of AT&T's and DirecTV's various excuses for their refusal to

18 contract with the Company are legitimate.  AT&T/DirecTV have claimed that they

19 cannot accommodate the Company's suite of networks due to limited bandwidth and

20 the cost of launching new networks, but these excuses are belied by carriage

21 agreements AT&T/DirecTV have entered into with similarly situated white-owned

22 networks.

23     19.    AT&T executives have admitted that AT&T and DirecTV have

24 excluded this African American–owned network provider.  AT&T has stated that it

25 will not consider paying for the Company's suite of television channels for any

26 AT&T/DirecTV video platforms unless the government forces AT&T to do business

27 with 100% African American–owned media in connection with its acquisition of

28 DirecTV.

20.     Thus, AT&T/DirecTV's personnel have brazenly acknowledged that they will continue to refuse to pay for the Company's channels unless governmental regulators require it.  This is an admission of racial discrimination in contracting and represents a deep form of institutionalized racism in violation of § 1981.

**D.     Racial Discrimination—Advertising**

21.     Other than paltry "token" payments, AT&T and DirecTV have also refused to contract with the Company for advertising.  AT&T spends approximately $4 billion a year advertising its goods and services.  DirecTV spends about $2 billion a year advertising its goods and services.  An executive working at AT&T's advertising agency has frequently expressed to the Company his frustration in trying to get his client, AT&T, to buy more of the Company's advertising beyond the paltry $200,000 a year currently spent.

22.     After exhausting all resources to achieve this goal, the advertising agency executive organized a conference call with the Company and AT&T's senior advertising executive, Michael Wright, Vice President of Media Services and Sponsorships, because the advertising agency believed that AT&T should grant the Company more advertising support.  During the call, the Company addressed the issue of AT&T not doing business with 100% African American-owned media.  Following the call, Mr. Wright refused to change AT&T's position, continuing AT&T's practice of racial discrimination in contracting.

23.     A review of AT&T's and DirecTV's advertising contracts, related correspondence and documentation through discovery in this action will confirm Defendants' pattern of racial discrimination in contracting for advertising expenditures:  Of the total approximate $6 billion spent on advertising, AT&T/DirecTV spend only about $200,000 a year or .00003—three ten thousandths of one percent annually—advertising on the Company's television channels and shows.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**E.**    <u>**This Lawsuit**</u>

24.    This lawsuit is brought pursuant to § 1981 of the Civil Rights Act, which provides that all persons in the United States shall have the same right to make and enforce contracts as is enjoyed by white persons.  Section 1981 prohibits racial discrimination in contracting and applies to both non-governmental and governmental discrimination.

25.    Racial discrimination in contracting is an ongoing practice in the media industry.  NAAAOM seeks to eliminate this discrimination, and to obtain equality in contracting for 100% African American–owned media.

26.    Defendants' ongoing refusal to contract with the Company constitutes unlawful racial discrimination in violation of § 1981, for which Plaintiff seeks to recover monetary damages resulting from Defendants' racial discrimination.

<u>**PARTIES, JURISDICTION AND VENUE**</u>

27.    Plaintiff NAAAOM is a California limited liability company, with its principal place of business in Los Angeles, California.  The Company is also a California corporation with its principal place of business in Los Angeles.

28.    AT&T, Inc., AT&T Services, Inc. and AT&T Mobility LLC are all Delaware corporations, with their principal places of business in Texas.  AT&T also has an office and operates in Los Angeles, California.

29.    DirecTV, LLC is a California limited liability company, with its principal place of business in El Segundo, California.

30.    Plaintiff is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to Plaintiff for the wrongs alleged herein.  The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiff at this time.  Accordingly, Plaintiffs sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

31.     This case is brought under a federal statute, § 1981 of the Civil Rights Act.  As such, there is federal question jurisdiction under 28 U.S.C. § 1331.

32.     Venue of this action is proper in Los Angeles because Defendants reside in this district, as defined in 28 U.S.C. § 1391, and the acts in dispute were committed in this district.

## FACTS

### A.     NAAAOM

33.     NAAAOM's mission is to eliminate racial discrimination and secure the economic inclusion of truly 100% African American–owned media in contracting, the same as white-owned media.

34.     NAAAOM was formed to protect 100% African American–owned media companies due to the history of industry retaliation and retribution against companies that stand up and speak out for fair contracting and economic inclusion for African Americans.

35.     NAAAOM is the Company's assignee of the litigation claim asserted in this lawsuit.

36.     Racial discrimination in the media has far-reaching adverse consequences.  It effectively excludes 100% African American-owned media companies, African American individuals, and their diverse viewpoints from the public airwaves, in derogation of the public interest.

37.     By virtue of this exclusion, 100% African American ownership in mainstream media is nearly extinct; and this illegal practice is self-perpetuating.

38.     The purpose of this lawsuit is to recover the billions in damages the Defendants have caused the Company; and to thereby set a precedent and send a message that racial discrimination in contracting is illegal.

### B.     AT&T's Acquisition of DirecTV

39.     AT&T is a multinational telecommunications and media company.  It is the second largest provider of mobile telephone and the largest provider of fixed

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

7

telephone in the United States.  It also provides broadband internet subscription television services.  AT&T is the 16th-largest non-oil company in the world.

40.     In May 2014, AT&T and DirecTV announced plans for AT&T to acquire DirecTV for $67 billion (inclusive of assumption of debt).  The deal was approved by the boards of both companies, but faces regulatory approval by the Federal Communications Commission ("FCC") and the U.S. Department of Justice.

41.     DirecTV is currently the second largest pay TV operator in the United States, serving approximately 20 million video programming customers.  AT&T's television platform serves approximately 5.7 million subscribers.  If the acquisition is approved by governmental regulators, it would create the largest pay television company in the United States, with nearly 26 million subscribers, very close to the FCC-mandated limit for television distributors such as AT&T and DirecTV (the current FCC limit is 30% of nationwide pay television subscribers which currently number approximately 100 million homes).

42.     Post-acquisition, AT&T will control a huge percentage of the market for television channel carriage.  This acquisition, like the proposed Comcast acquisition of Time Warner Cable, will result in more consolidation (and thus fewer options) in the industry especially for African American-owned media companies.

43.     Network and video programming owners and distributors like the Company, are reliant upon television distributors, like AT&T and DirecTV, not only to realize subscriber and advertising revenue, but also to reach television consumers.  If AT&T gets bigger but continues to refuse to contract with 100% African American owned media, it can and will prevent the channels owned by the Company from reaching its millions of subscribers, thus further eliminating diverse viewpoints, contrary to the public interest.

44.     Presently, AT&T spends approximately $4 billion dollars in channel carriage license fees each year, none of which goes to 100% African American–owned media.  DirecTV spends approximately $12 billion in channel carriage

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

license fees each year, none of which goes to 100% African American owned media.

45.     If AT&T's bid for DirecTV is approved, of the $16 billion spent for channel carriage by the combination of AT&T and DirecTV, none of it will be paid to 100% African American–owned media.  Meanwhile, the combined AT&T/DirecTV will collect billions of dollars from its television subscribers annually, a substantial portion coming from African American consumers.

46.     Similarly, of the approximately $6 billion a year spent on television advertising by AT&T and DirecTV, almost none is paid to 100% African American–owned media.  But, of course, AT&T and DirecTV collect very substantial revenues from African American consumers.

47.     There is a statistic that highlights the inequity here:  The Chairman, CEO and President of AT&T, Randall Stephenson, was personally paid more in compensation in 2013 alone—approximately $23 million—than all of AT&T paid to 100% African American owned–media for programming, channel carriage and advertising combined during the same year.  Unfortunately, this statistic continues for DirecTV, whose Chairman, CEO and President, Michael White, was personally paid approximately $13 million in 2013 – again, more than DirecTV paid to 100% African American owned–media for programming, channel carriage and advertising combined during the same year.

48.     The combined economic impact of Defendants' racial discrimination in contracting is significant and will serve to perpetuate the economic exclusion of 100% African American-owned media from American television.  In totality, through discovery and review of AT&T and DirecTV channel carriage agreements and advertising contracts, including their related correspondence and documentation, the numbers speak volumes.

49.     Of the approximately $22 billion AT&T and DirecTV spend annually ($16 billion in channel carriage license fees and $6 billion in advertising) with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

white-owned media, it is believed that less than $3 million—.00014 or fourteen thousandths of one percent—is spent annually with 100% African American-owned media.  This is an economic atrocity, illustrating the scope and magnitude of the racial discrimination in contracting by AT&T and DirecTV.

50.    The Company is being discriminated against on account of race in connection with contracting, in violation of § 1981.  Without access to viewers and without licensing fees and advertising revenues from two of the largest video programming distributors in the country, this 100% African American–owned media business is being shut out and is being severely damaged.

**C.    <u>Racial Discrimination In Contracting</u>**

51.    The United States Supreme Court has held that the First Amendment to the Constitution requires wide dissemination of information from diverse viewpoints and sources.  Indeed, one of the primary concerns with the increased consolidation of television distributors is the corresponding consolidation of sources of information.

52.    The rationale behind this law is important:  Television is among the most prevalent ways that Americans obtain information today.  Without a multiplicity of diverse ownership and delivery of informational sources, this First Amendment goal cannot be achieved.

53.    Major distributors, like AT&T and DirecTV, have unique power to limit, through racial discrimination in contracting, the viewpoints available in the marketplace.  Such power will be dramatically increased following AT&T's acquisition of DirecTV.

54.    Defendants limit the diversity of television programming available to their subscribers by refusing to contract with 100% African American–owned media.

55.    Defendants reject African American programming vendors in favor of white-owned vendors.  In fact, AT&T and DirecTV block entry into their television

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

platforms for 100% African American–owned media by making up phony excuses about limited bandwidth and cost.

56.     Defendants discriminate in the terms and conditions of their contracts with African American owned–media as compared to white-owned media, including the refusal to pay channel carriage license fees to 100% African American owned–media and the refusal to contract for advertising.

57.     In many cities where Defendants have a share of the television distribution market, African Americans comprise not only a large part of the population but also account for significantly higher television viewership than other demographic groups.  However, the availability of content produced and owned by 100% African American–owned media on Defendants' systems does not remotely reflect their subscriber base or viewership makeup.

58.     None of the networks distributed and receiving licensing fees on AT&T's and DirecTV's television platforms is 100% African American owned. Although Defendants' African American subscribers pay very substantial subscriber fees, and constitute a significant advertising target for Defendants, Defendants pay nothing to 100% African American–owned media for channel carriage and nearly nothing for advertising.

59.     The Company has been knocking on AT&T's and DirecTV's doors since 2007 seeking a carriage agreement for its channels.  Defendants have steadfastly refused to contract for this carriage.

60.     Notwithstanding the foregoing, AT&T does carry one of the Company's seven television channels, but AT&T pays the Company nothing for the carriage of this channel, unlike similarly situated, white-owned channels.  Instead, AT&T requires the Company to pay it—AT&T—hundreds of thousands of dollars per year for this programming.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

61.    DirecTV refuses to carry any of the Company's channels.  In fact, DirecTV has demanded that the Company pay it approximately $20 million annually for DirecTV to launch just one of the Company's seven channels.

62.    DirecTV knows the Company cannot afford to pay this amount.  By comparison, DirecTV pays white-owned media networks approximately $12 billion annually to exhibit their channels to DirecTV's 20+ million subscribers.

63.    DirecTV even refused to carry the first and only 100% African American-owned 24-hour court and news channel that the Company offered to DirecTV for free (*i.e.*, without charging channel carriage license fees).  The only way DirecTV was willing to carry the channel was for the annual payment of $20 million.  This channel has an established track record and would benefit DirecTV's viewers by providing diversity in voices and viewpoints—a core First Amendment value that is in the public interest.

64.    By this lawsuit, the Company seeks damages as a result of unlawful racial discrimination in contracting, which has severely devalued the Company's business.

**D.    AT&T's Racial Animus**

65.    The Company's primary point of contact at AT&T has been through a senior AT&T executive (the "AT&T Executive").  The AT&T Executive's boss and the individual in charge of making carriage agreements for AT&T is Aaron Slater, President of Content and Advertising Sales.

66.    The Company has been trying for almost two years to schedule a meeting with Mr. Slater but has been given various excuses as to why he will not meet—he is too busy, does not have an assistant, etc.  These excuses are a pretext for refusing to meet and to avoid contracting with the Company.

67.    The AT&T Executive has stated to the Company that even if a meeting were to be scheduled, the Company's President and CEO, an African American,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

should not bring up "that Black stuff" to Mr. Slater because he will "go ballistic" and terminate the meeting.

68.     Immediately after AT&T announced its bid to acquire DirecTV, the AT&T Executive stated on a telephone call with the Company that AT&T and DirecTV know they have "a Black problem" that could become a stumbling block to obtaining government approval of the AT&T/DirecTV transaction.

69.     The AT&T Executive stated that, just after the DirecTV acquisition was announced, AT&T held a call with its "lobbyists" in Washington, D.C.  The AT&T Executive said that AT&T and DirecTV were "vulnerable" in Washington, D.C. because they were not doing business with African American–owned media, and this could present a problem for approval of the acquisition.

70.     In an effort to deal with its "Black problem," AT&T conducted research to determine which channels are truly African American owned, as opposed to channels whose programming targets African American viewers but are not actually owned by African Americans (e.g., BET which is owned by Viacom).

71.     The AT&T Executive acknowledged that the "African American networks" Comcast launched following its acquisition of NBC Universal are not "real" African American–owned networks, but rather networks that use token African American celebrities as "fronts" for white-owned media interests.

72.     The AT&T Executive further told the Company that certain people thought AT&T and DirecTV should get ahead of the curve with regard to its "Black problem" by contracting with 100% African American–owned networks, while others thought AT&T and DirecTV should "wait and see" what the FCC and/or DOJ required in connection with the AT&T/DirecTV transaction.

73.     The AT&T Executive stated that if forced by the DOJ and/or FCC, AT&T may do business with the Company because, unlike the channels launched by Comcast to obtain approval of the NBC-Universal acquisition, the Company was truly African American–owned; and it is the cheapest option.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

74.     Ultimately, AT&T stated that it would consider entering into a carriage agreement with the Company only if AT&T's and DirecTV's lack of 100% African American-owned channels interferes with approval of the acquisition. Otherwise, AT&T would continue to refuse to contract with the Company for its suite of channels, and would shut out the Company from its billions in channel carriage license fees and advertising expenditures.

75.     AT&T and DirecTV know (in their own words) that they have a "Black problem." They know they are violating the law. But AT&T and DirecTV are not genuinely interested in doing business with 100% African American–owned media and have stated that they will not do so unless legally required by governmental regulators.

76.     There is a blatant recent example of AT&T's unequal treatment/racial discrimination: AT&T has given Peter Chernin, a prominent white businessman, $500 million to produce lifestyle-related video programming on many of the same subjects and genres already produced and owned by the Company, and which are available on the Company's channels. Thus, to avoid doing business with the Company, AT&T has invested a half billion dollars for a white businessman to develop the same programming from scratch that the Company has already been producing and making available on its channels for six years, and all of which has been readily available for licensing.

77.     This is the epitome of discrimination: Although admitting that the Company's suite of channels is good enough for AT&T's television platform, AT&T pays a white-owned, start-up a half billion dollars to create similar programming and channels.

78.     By its actions, AT&T has made clear that it does not want to, and will not, contract for channel carriage with, and will not pay license fees to, the Company—a 100% African American–owned content provider/multi-network owner—unless the government requires it.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

79.     AT&T excludes the Company in other ways as well.  While it invites white executives from white-owned media companies to its business functions, it excludes African American executives from the Company.  AT&T treats entry into its television business like a "white old boys' club."

80.     AT&T/DirecTV have used phony excuses to justify their racial discrimination in contracting.  They claim they do not have the bandwidth to accommodate the Company's channels.  But they have entered into carriage agreements with other, similarly situated white-owned channels.

81.     In that regard, AT&T/DirecTV have "discovered" additional bandwidth to launch networks for white-owned media, while it continues to blame lack of bandwidth for refusing to contract with the Company for carriage of its channels. This is a pretext—a phony excuse—and evidences racial discrimination in contracting, in violation of § 1981.  It is well past the time for AT&T and DirecTV to stop the financial discrimination and economic genocide against 100% African American-owned media.

**E.     "Tokenism" And Sham "Diversity Agreements"**

82.     The exclusion of African American–owned channels and video programming from distribution on major television platforms is well-recognized. Yet, white-owned media and governmental regulations have done very little to address the inequities faced by 100% African American-owned media.

83.     Instead, in cahoots with the FCC and non-media civil rights advocacy groups, the major white-owned video programming distributors have concocted ways to perpetuate the exclusion of truly 100% African American–owned networks.

84.     In particular, white-owned media companies have made monetary "contributions" to various minority special interest groups in order to "buy" support. This is window dressing and a deceptive practice.

85.     They have hired African American former government officials— including an FCC commissioner—onto their staffs; and they have entered into so-

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  called "memoranda of understanding" with non-media civil rights advocacy groups,

2  such as the NAACP, the National Urban League and Al Sharpton, who neither own

3  nor operate any media business.

4       86.    These memoranda of understanding are hypocritical shams.  In fact, the

5  "African American-owned networks" that were ultimately launched were backed

6  and controlled by white businesses, using token African American celebrities as the

7  face of the networks.  And the networks were set up for failure, with short-term

8  carriage agreements and minimal or no license fees.

9       87.    The memoranda of understanding were given the appearance of

10  legitimacy because they were signed off by various non-media minority-interest

11  groups and because the FCC sanctioned them.  But in effect, all they did was to

12  enable the white-owned media companies to tout their "commitment" to racial

13  diversity, without actually granting any 100% African American–owned media

14  access to their nationwide television platforms.

15       88.    In this regard, AT&T has taken a page out of Comcast's playbook.  In

16  connection with securing approval of the DirecTV transaction, instead of fixing their

17  self-admitted "Black problem" by negotiating in good faith—and contracting—with

18  100% African American–owned media, AT&T is engaging in the nefarious, sham

19  practices referenced herein.

20       89.    Specifically, AT&T is paying off non-media, so-called African

21  American civil rights groups—such as the National Urban League and Reverend

22  Jesse Jackson, among others—in order to "buy" their endorsement for its acquisition

23  of DirecTV.

24       90.    AT&T and DirecTV pay these non-media civil rights groups to

25  publicly laud the companies as "good corporate citizens."  This is hypocrisy:  In

26  October 2014, the federal government sued AT&T for engaging in unfair and

27  deceptive business practices which cheated their customers.  AT&T is hardly the

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

good corporate citizen these non-media civil rights groups were paid off to proclaim and endorse.

91. In exchange for "donations," these non-media civil rights groups and individuals have helped to whitewash and cover-up AT&T's illegal behavior and business practices. In fact, the National Urban League recently held a lunch in Washington D.C. endorsing AT&T and giving it an award. AT&T's payments are designed to silence the African American community and divert attention away from Defendants' refusal to contract with 100% African American–owned media businesses (*i.e.*, its "Black problem").

## CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1981)

### A.   Section 1981 Claim

92. NAAAOM refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

93. Section 1981 of the Civil Rights Act, known as the Civil Rights Act of 1866, provides for the equality of citizens of the U.S. It prohibits racial discrimination in, among other things, contracting. This includes, according to the statute, "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

94. African Americans are a protected class under § 1981. The Company is a 100% African American owned media business. To the best of Plaintiff's knowledge, the Company is the only 100% African American–owned video programming producer and multi-channel owner in the United States.

95. As alleged herein, the Company has diligently, over many years, attempted to contract with AT&T and DirecTV to carry its programming and channels, but they have refused. Throughout this time, Defendants have continued to contract with—and make themselves available to contract with—similarly situated white-owned television channel providers.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

96.     For example, AT&T recently picked up RFD-TV, a white-owned television channel focused on rural issues, such as farming and agriculture.  There is less demand for this genre of channel (i.e., RFD-TV) from AT&T's subscribers—many of whom are based in urban areas—than there is for the Company's channel genres.

97.     AT&T has also contracted to carry other white-owned channels while refusing to contract with the Company for carriage of its suite of channels; this evidences a discriminatory practice in violation of Section 1981.

98.     The Company has been deprived of the right to contract—or to attempt to contract—with Defendants while entities outside the protected class have been afforded that right.  There are many similarly situated white-owned channels that received more favorable treatment from Defendants than the Company.

99.     AT&T has dealt with the Company in a markedly hostile manner and in a manner which a reasonable person would believe is racially motivated and is discriminatory.  AT&T has refused to meet with the Company's African American owner and top executive, and has even refused to return his telephone calls.

**B.      Damages**

100.    But for AT&T's and DirecTV's refusal to contract with the Company, the Company would receive approximately $328 million in annual license fees for its seven channels—calculated using a conservative license fee of fifteen cents per subscriber per month for each channel for AT&T's and DirecTV's combined 26 million subscribers.  If Defendants contracted in good faith, the Company would also receive an estimated $100 million per year, per network, in national advertising sales revenue, or a total of $700 million per year.

101.    Combining subscriber fees and advertising revenue, the Company would generate approximately $1.0 billion in annual revenue from its relationship with Defendants.  Moreover, with distribution on one of the largest television platforms in the nation, the demand for the Company's channels would increase,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

leading to additional opportunities and revenue for the Company to license its channels to other similar television distributors.

102.   Based on the revenue the Company would generate if Defendants contracted with them in good faith, the Company would be valued at approximately $10 billion dollars.

103.   Similarly situated lifestyle and entertainment media companies are valued at higher amounts.  But for AT&T's and DirecTV's refusal to contract with the Company, the Company would have a similar valuation.

104.   Accordingly, AT&T's and DirecTV's unlawful discrimination has caused Plaintiff in excess of $10 billion in damages, according to proof at trial; plus punitive damages for intentional, oppressive and malicious racial discrimination.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment, as follows:

1.   For compensatory, general and special damages in excess of $10 billion according to proof at trial;

2.   For punitive damages, based on oppression and malice, according to AT&T and DirecTV's net worth;

3.   For attorneys' fees, costs and interest; and

4.   For such other and further relief as the court deems just and proper.


DATED:  December 2, 2014          MILLER BARONDESS, LLP


                                  By:   /s/ *Louis R. Miller*
                                  _____
                                  LOUIS R. MILLER
                                  Attorneys for Plaintiff

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury pursuant to the Seventh Amendment of the U.S. Constitution.

DATED:  December 2, 2014          MILLER BARONDESS, LLP


                                  By:   /s/ *Louis R. Miller*
                                        LOUIS R. MILLER
                                        Attorneys for Plaintiff