1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  AMNON Z. SIEGEL (State Bar No. 234981)
   asiegel@millerbarondess.com
3  LAUREN R. WRIGHT (State Bar No. 280809)
   lwright@millerbarondess.com
4  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
   Telephone:  (310) 552-4400
6  Facsimile:  (310) 552-8400

7  Attorneys for Plaintiffs

8              UNITED STATES DISTRICT COURT

9     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  National Association of African-          CASE NO. 2:14-cv-09256-PJW
    American Owned Media, a California
12  limited liability company; and            SECOND AMENDED COMPLAINT
    Entertainment Studios Networks, Inc., a   FOR RACIAL DISCRIMINATION
13  California corporation,                    IN VIOLATION OF 42 U.S.C.
                                               § 1981; AND FOR DAMAGES AND
14            Plaintiffs,                       INJUNCTIVE RELIEF

15       v.                                    DEMAND FOR JURY TRIAL

16  AT&T, Inc. a Delaware corporation;
17  AT&T Services, Inc., a Delaware
    corporation; AT&T Mobility LLC, a
18  Delaware corporation; and DirecTV, a
    California limited liability company;
19  and DOES 1 through 10, inclusive,

20            Defendants.

21

22

23

24

25

26

27

28

257946.1

_____
                SECOND AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1
2

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................ 1

    A.    AT&T and DirecTV Executives Discriminate on the Basis of Race; and Then the Executives and AT&T Inc. Board Cover-Up the Discrimination ........................................................................ 1

    B.    AT&T's Obstruction of Justice and Attempted Spoliation of Evidence ................................................................................... 6

    C.    AT&T and DirecTV ...................................................................... 7

    D.    NAAAOM / Entertainment Studios.......................................... 10

    E.    Racial Discrimination—Channel Carriage ............................. 12

    F.    Racial Discrimination—Advertising ...................................... 16

    G.    This Lawsuit ............................................................................. 18

PARTIES, JURISDICTION AND VENUE ............................................. 19

FACTS ..................................................................................................... 21

    A.    AT&T's Acquisition of DirecTV ............................................. 21

    B.    Racial Discrimination In Contracting ................................... 23

    C.    AT&T's Racial Animus and Cover-Up of Racial Discrimination ....... 27

    D.    "Tokenism" And Sham "Diversity Agreements" ................... 33

CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1981)....... 35

    A.    Section 1981 Claim .................................................................. 35

    B.    Damages .................................................................................... 37

PRAYER FOR RELIEF .......................................................................... 38

DEMAND FOR JURY TRIAL ............................................................... 39

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1        Plaintiffs National Association of African-American Owned Media
2   ("NAAAOM") and Entertainment Studios Networks, Inc. ("Entertainment Studios"
3   and collectively, "Plaintiffs") allege against Defendants AT&T, Inc., AT&T
4   Services, Inc., AT&T Mobility LLC (collectively, "AT&T" ), DirecTV, LLC
5   ("DirecTV"), and Does 1 through 10, inclusive (collectively, "Defendants"), as
6   follows:

## **INTRODUCTION**

**A.**    **AT&T and DirecTV Executives Discriminate on the Basis of Race; and**
       **Then the Executives and AT&T Inc. Board Cover-Up the Discrimination**

10       1.    This case is about racial discrimination by Defendants AT&T and
11   DirecTV—two of the largest television distribution companies in the United
12   States—against African Americans in contracting for television channel carriage
13   and advertising.  These companies are preparing to merge into what will be the
14   largest pay-television distributor in the United States:  Post-acquisition, AT&T will
15   oversee television content for more than 30 million subscribers, which constitutes
16   approximately 30% of total pay-TV subscribers in the country.

17       2.    AT&T and DirecTV have shut out African American–owned media.
18   Of the combined approximately $22 billion these two companies spend annually in
19   channel carriage fees and advertising, 100% African American–owned media
20   companies receive less than $3 million per year.

21       3.    The lack of content produced by African American–owned media
22   companies on AT&T's and DirecTV's television platforms is the result of
23   intentional racial discrimination.  Indeed, Plaintiffs have compelling evidence of
24   racial animus by AT&T that permeates the company and that is condoned, ratified
25   and encouraged by top AT&T Inc. executives and board members, including
26   Randall L. Stephenson (Chairman and Chief Executive Officer of AT&T Inc.),
27   Joyce M. Roché (AT&T Inc. board member and Chairperson of the Human
28   Resources Committee), David S. Huntley (AT&T Inc. Chief Compliance Officer),

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1

1  Lori Lee (AT&T Inc. Senior Executive Vice President and Global Marketing

2  Officer), and John T. Stankey (AT&T Inc. President Home Solutions and Chief

3  Strategy Officer).

4         4.      These AT&T Inc. executives and board members have turned a blind

5  eye to AT&T's racist policies and practices and have actively engaged in a cover-up

6  of racial discrimination by high-level AT&T executives.  As particularly relevant

7  here, AT&T granted an executive who demonstrated racial animus toward African

8  Americans decision-making authority over AT&T's television content and

9  advertising sales, resulting in the near-complete exclusion of—and unequal

10 contracting terms for—content produced by 100% African American–owned media

11 companies on AT&T's U-Verse television platform.

12        5.      AT&T's now-former President of Content and Advertising Sales,

13 Aaron Slator ("Slator") harbors deep-seated racial animus against African

14 Americans.  There is concrete, irrefutable evidence of Slator's—and hence

15 AT&T's—racial animus, based on images sent from Slator's company phone:

16

17

18

19

20

21

22

23

24

25

26

27

28




MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

257946.1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

6.     Copies of these images from Slator's company phone, along with his text messages, are attached hereto as **Exhibit A**.

7.     These images are grossly offensive.  Slator condones the use of the "N-word" and transmits racially offensive depictions.  In fact, when he sent the picture of the Black child to his friend with the words "It's Friday Niggas" written above, he referred to it as an "oldie but goodie."  The fact that Slator sent these images over his work phone evidences callous racial bigotry.

8.     These derogatory images evoke the type of deep-rooted and overt racism that existed in this country in the mid-19th Century.  Whites objectified African Americans; they ridiculed and mocked African culture; they sexualized Black women; they used the "N-word"; and they viewed African Americans as primitive and sub-human.  As a result, African Americans were illegally denied fundamental liberties and privileges to which all Americans are entitled, which is why Congress enacted the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  A person with such racial bias carries these prejudices into all aspects of his life, including his work.

9.     Plaintiff Entertainment Studios is a 100% African American–owned media company.  It is a fully integrated media production and distribution company with eight HD networks (channels), dozens of first-run syndicated shows and over 5,000 hours of programming.  Slator's overt racial bias is consistent with Slator's treatment of Entertainment Studios.  For years, Entertainment Studios has attempted to contract with AT&T for channel carriage and advertising, but it has been rebuffed at every step by Slator.

10.    At times, Slator even refused to meet with Entertainment Studios, stating that Entertainment Studios' African American owner should not bring up "that Black stuff."  Slator and other AT&T executives under him refused to take Entertainment Studios' calls, declined to set meetings with Entertainment Studios, and have generally avoided Entertainment Studios altogether.  Moreover, Slator

1  directed other AT&T employees to avoid Entertainment Studios' calls and attempts

2  to meet.  Slator's racial animus explains his decision not to do business with

3  Entertainment Studios.

4        11.    AT&T has known about Slator's racial animus for years but has done

5  nothing about it.  In fact, AT&T's board members, AT&T's Human Resources

6  Department, and AT&T's supposedly third-party equal employment opportunity

7  representative, Stephanie Davis, were all aware of the racist images on Slator's

8  phone.  Instead of terminating or reprimanding this racist executive, AT&T gave

9  Slator more power and attempted to cover up his racist acts.  AT&T even paid to

10 silence a former African American employee who worked for—and suffered

11 under—Slator to keep these images and Slator's racism under wraps.

12       12.    Slator was appointed to the head of television content and advertising

13 sales by AT&T Inc's Board of Directors, and he reported to the top executives at

14 AT&T in Dallas, including its Chairman and Chief Executive Officer, Randall L.

15 Stephenson.  By allowing Slator to operate as a top executive at the company

16 notwithstanding his racial bias, and knowing of his animus toward African

17 Americans, AT&T condoned and ratified racist practices and racially offensive

18 behavior at the highest levels of the company.

19       13.    It was not until after Plaintiffs filed their proposed Second Amended

20 Complaint, which publicly set forth the indisputable evidence of Slator's racial

21 animus, that AT&T finally took action by terminating Slator.  The press release

22 AT&T issued regarding Slator's termination is telling:  "Aaron Slator has been

23 terminated.  There is no place for demeaning behavior within AT&T and ***we regret***

24 ***the action was not taken earlier***."  In other words, AT&T admitted that it knew

25 about Slator's racial animus and "demeaning behavior," but nevertheless allowed

26 him to maintain a high-level executive position with decision-making authority over

27 the content AT&T distributes to its millions of television subscribers.

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

14.     AT&T's systemic racism affects African American companies that try to do business with it, like Entertainment Studios; AT&T's African American workforce; and the public.  Slator oversaw television content strategy for AT&T's 6 million subscribers.  In other words, a racist with discriminatory animus controlled what the public watches—and does not watch—on AT&T's television platform.  Slator's programming decisions were driven not by the quality of—or demand for—the programming, but by the racial identity of the programming provider.

15.     AT&T's cover-up of racism goes beyond Slator.  DirecTV's top content position is held by Dan York, who served as AT&T's long-time head of television content (Slator's predecessor) prior to moving to DirecTV.  York, like Slator, presided over a culture of racism at AT&T.  While the head of content at AT&T, York refused to hire African American employees.  Again, AT&T allowed an executive with demonstrated racial animus to preside, unchecked, over AT&T's programming decisions.

16.     Not only does York discriminate against African American employees, but he also discriminates on the basis of race when making channel carriage decisions.  Just as Slator refused to deal with Entertainment Studios, so too did York.  York rejected Entertainment Studios' channels at a meeting with Entertainment Studios' President and owner, Byron Allen.  York told Allen that he did not need to license Entertainment Studios' content because AT&T already had "racial cover."

17.     According to York, he made a deal whereby AT&T paid money to African American civil rights activist, Jesse Jackson.  York deemed this "deal" with Jackson sufficient to provide "racial cover" against any future discriminatory refusals to deal with African American–owned businesses.

18.     York carried this discriminatory attitude with him to the top programming job at DirecTV.  There, York has demanded exorbitant and unreasonable amounts from Entertainment Studios in order to distribute its channels

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1    on DirecTV's platform, as alleged herein.

2       19.    The discriminatory animus of AT&T's and DirecTV's top

3 programming officials infects their carriage decisions and explains their

4 discriminatory refusals to do business with 100% African American–owned media

5 companies, like Entertainment Studios, in violation of Section 1981.

6 **B.**     **AT&T's Obstruction of Justice and Attempted Spoliation of Evidence**

7       20.    AT&T's attempts to cover-up the racism of its high-level executives

8 continue to this day.  In connection with a pending racial discrimination lawsuit

9 against AT&T and its executives and Board members, among others, AT&T's

10 counsel has contacted a third-party witness to discourage her from complying with a

11 lawfully issued subpoena.

12       21.    The subpoena at issue seeks documents relating to Slator's

13 discriminatory conduct toward his former executive assistant at AT&T, an African

14 American woman.  The documents sought by the subpoena will further establish

15 that high-level AT&T executives and Board  members not only knew about Slator's

16 racial animus, but took steps to sweep it under the rug—including by paying off this

17 former employee in order to silence her and to ensure the racist images from Slator's

18 company phone would not be made public.

19       22.    Through counsel, AT&T sent this former AT&T employee a letter

20 telling her to "take caution" before producing documents in response to the

21 subpoena.  This not-so-veiled threat constitutes an obvious attempt to influence this

22 witness' compliance with a court-issued subpoena.  AT&T is doing everything it

23 can—including engaging in possible witness tampering—to ensure that evidence

24 regarding its executives' and Board members' knowledge and tolerance of racism at

25 AT&T is not disclosed.

26       23.    AT&T's conduct in this regard constitutes obstruction of justice and

27 attempted spoliation of evidence relevant not only to that lawsuit, but also to this

28 one.  It is part and parcel of the AT&T's illegal cover-up of discrimination by

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  AT&T executives and its Board.

2  **C.     AT&T and DirecTV**

3        24.     AT&T and DirecTV are preparing to merge into what will be the

4  largest pay-television distributor in the United States.

5        25.     African Americans comprise 13% of the U.S. population and represent

6  more than $1 trillion in consumer spending power.  AT&T, one of the largest

7  companies in the world, is about to quadruple the size of its pay television business

8  through its $67 billion (with assumption of debt) acquisition of DirecTV.  DirecTV

9  is the second-largest video programming service in the country.  Both profit greatly

10  by providing television service to African Americans.

11        26.     Despite the foregoing, African American–owned media has been

12  substantially shut out by AT&T and DirecTV.  Of the approximately $4 billion in

13  fees that AT&T pays annually to license video programming via channel carriage

14  agreements,[1] zero dollars are paid to 100% African American–owned media

15  companies.  Further, of the additional approximately $4 billion AT&T spends each

16  year on advertising, 100% African American–owned media receives less than $1.5

17  million per year.

18        27.     DirecTV—with four times more pay-tv subscribers than AT&T—

19  spends approximately $12 billion annually for channel carriage, but like AT&T,

20  none of that $12 billion is paid for channel carriage from 100% African American–

21  owned media.  And again, of the additional approximately $2 billion DirecTV

22  spends annually on advertising, 100% African American–owned media receives less

23  than $1.5 million per year.

24

25  _____

26  [1]  A carriage agreement is a contract between a multichannel video programming
distributor, such as AT&T or DirecTV, and a video programming vendor, such as
27  Entertainment Studios, granting the distributor the right to "carry" (that is, distribute) the
programmer's content.
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

257946.1

SECOND AMENDED COMPLAINT

28.     AT&T's top ten investors are large institutional investment groups or pension funds, including Vanguard Group, Inc.; State Street Corp; Evercore Trust Company, N.A.; BlackRock Fund Advisors; Northern Trust Investments, N.A.; Dimensional Fund Advisors, Inc.; Capital Research Global Investors; T. Rowe Price Associates, Inc.; Geode Capital Management, LLC; and Franklin Advisers, Inc. DirecTV's top ten investor make-up is likewise, with significant overlap:  Berkshire Hathaway, Inc.; Vanguard Group, Inc.; State Street Corp; BlackRock Fund Advisors; Capiral Research Global Investors; PRIMECAP Management Company; Highfields Capital Management LP; Pentwater Capital Management LP; Paulson & Company, Inc.; and Fidelity Management and Research Company.

29.     These investment groups are funded by a diverse community, including many African American constituents, and generally purport to invest in companies which are, among other things, socially responsible and non-discriminatory in their business practices.  Yet these financial institutions support AT&T and DirecTV as AT&T and DirecTV exclude 100% African American–owned media companies, in violation of Section 1981.

30.     Nor do the Boards of Directors of AT&T and DirecTV do anything to combat AT&T's and DirecTV's racial discrimination in contracting.  AT&T's Board of Directors is headed up by Chairman and CEO Randall L. Stephenson, and includes fourteen other members:  Joyce M. Roché, Reuben V. Anderson, Jaime Chico Pardo, Scott T. Ford, Glenn H. Hutchins, James P. Kelly, William E. Kennard, Jon C. Madonna, Michael B. McCallister, John B. McCoy, Beth E. Mooney, Matthew K. Rose, Cynthia B. Taylor, and Laura D'Andrea Tyson. DirecTV's Board of Directors is headed up by Chairman and CEO Michael D. White, and includes eleven other members: Peter A. Lund, Nancy S. Newcomb, Ralph F. Boyd, Samuel DiPiazza, Neil R. Austrian, David B. Dillon, Dixon R. Doll, Abelardo E. Bru, Charles R. Lee, Anthony J. Vinciquerra, and Lorrie M. Norrington.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**8**

31.     The members of AT&T's and DirecTV's Boards of Directors are aware, or should be aware, of AT&T's and DirecTV's refusal to contract for carriage and advertising with 100% African American–owned media, yet they have done nothing to change these companies' racist and discriminatory practices. Indeed, as alleged herein, AT&T's Board of Directors has actively engaged in an illegal cover-up of the racist acts of high-level AT&T executives.  This type of corporate governance is unacceptable.

32.     For AT&T and DirecTV, it is a one-way street.  While these companies take billions from the African American community, they pay 100% African American–owned media companies less than $3 million out of $22 billion spent on carriage fees and advertising per year.

33.     Senior AT&T executives have acknowledged that AT&T and DirecTV have (in their words) "a Black problem," which makes them "vulnerable" with governmental regulators in Washington, D.C. who will eventually decide the fate of the AT&T acquisition of DirecTV.  But AT&T and DirecTV still refuse to pay for channels owned by, and refuse to advertise with, 100% African American–owned media companies.

34.     AT&T is proposing to acquire DirecTV to significantly expand its video programming distribution to American consumers.  This acquisition will dramatically increase AT&T's market share in the pay-television sector, making it the largest pay-television operator in the country.  The acquisition is part of a growing national trend of media consolidation that will further concentrate racial discrimination in contracting against 100% African American–owned media companies and eliminate diverse voices, contrary to the public interest.

35.     White-owned media has deceptively worked hand-in-hand with governmental regulators to perpetrate the exclusion of 100% African American–owned media from being paid for channel carriage.  This has been done through, among other things, the use of "tokens" and "window dressing"—African American

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1  celebrities posing as "fronts" or "owners" of channels, which are truly

2  owned/controlled by white-owned media, and by way of ineffectual, sham "diversity

3  agreements" with non-media civil rights groups and individuals.

4        36.    Moreover, AT&T has made cash donations to non-media civil rights

5  groups to "buy" their support, effectively "buying" their approval of AT&T's

6  acquisition of DirecTV.  This is yet another tactic to divert attention away from

7  AT&T/DirecTV's self-admitted "Black problem" and their continuing violation of

8  Section 1981.

9  **D.**    **NAAAOM / Entertainment Studios**

10       37.    Historically, because of the lack of distribution/advertising support and

11  economic exclusion, 100% African American–owned media has been forced either

12  to (i) give away significant equity in their enterprises; (ii) pay exorbitant sums for

13  channel carriage, effectively bankrupting them; or (iii) go out of business, all

14  pushing 100% African American–owned media to the edge of extinction.

15       38.    NAAAOM was created and is working to obtain for 100% African

16  American–owned media the same contracting opportunities as their white

17  counterparts for distribution, channel carriage, channel positioning and advertising

18  dollars.  Its mission is to secure the economic inclusion of truly 100% African

19  American–owned media in contracting, the same as white-owned media.

20       39.    Entertainment Studios is a member of NAAAOM.  It is a 100% African

21  American–owned media company involved in the production and distribution of

22  television programming through broadcast television, its eight cable television

23  networks, and its subscription-based internet service.  It is the only 100% African

24  American–owned video programming producer and multi-channel operator/owner

25  in the United States.

26       40.    Entertainment Studios was founded in 1993 by Byron Allen, an African

27  American actor / comedian / media entrepreneur.  Allen first made his mark in the

28  television world in 1979, when he was the youngest comedian ever to appear on

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   "The Tonight Show Starring Johnny Carson."  He thereafter served as the co-host of

2   NBC's "Real People," one of the first reality shows on television.  Alongside his

3   career "on-screen," Allen developed a keen understanding of the "behind the

4   scenes" television business, and over the past 22+ years he has built Entertainment

5   Studios into a successful, independent media company.

6       41.    Entertainment Studios has carriage agreements for its television

7   channels with more than 40 television distributors nationwide, including major

8   distributors such as Verizon, Century Link and RCN.  These television distributors

9   pay Entertainment Studios license fees to distribute its content and make

10  Entertainment Studios' channels available to their combined 7.5 million subscribers.

11      42.    Entertainment Studios owns eight original content, high definition

12  television networks (channels), six of which were launched to the public in 2009,

13  one in 2012 and one in January 2015.  Entertainment Studios produces, owns, and

14  distributes over 32 television series on broadcast television, with thousands of hours

15  of video programming in its library.  Entertainment Studios' shows have been

16  nominated for, and won, the Emmy award.  A copy of an Entertainment Studios

17  promotional presentation highlighting key aspects of the company and the

18  programming it produces is attached hereto as **Exhibit B**.

19      43.    Most recently, in December 2012, Entertainment Studios launched

20  "Justice Central," a 24-hour, high definition legal and news network featuring

21  several Emmy-nominated and Emmy-award winning legal/court shows.  After just

22  two years, Justice Central has already proved itself a successful, high-demand

23  network.  Justice Central has boasted tremendous ratings growth across key

24  television viewing periods.  Justice Central's double- to triple-digit ratings growth

25  outperformed the vast majority of white-owned networks that AT&T and DirecTV

26  pay substantial license fees to carry.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

E.     **Racial Discrimination—Channel Carriage**

44.     In their contracting policies and practices, AT&T and DirecTV have discriminated, and are discriminating, against Entertainment Studios on account of race, in violation of Section 1981.

45.     AT&T claims to do business with 100% African American–owned media because it carries a single one of Entertainment Studios' channels, Justice Central.  But in fact, this single carriage contract is further evidence of AT&T's racial discrimination in contracting:  Although AT&T granted Entertainment Studios a carriage agreement for Justice Central, the agreement provides that, for at least 10 years, AT&T will pay no license fees to Entertainment Studios.  This is in stark contrast to the many white-owned channels which AT&T launched during the same period, which receive substantial license fees from AT&T.  In addition to stiffing Entertainment Studios on the license fee, AT&T told Entertainment Studios it must pay AT&T a minimum of $1 million for the cost of bandwidth.

46.     Justice Central has proved to be one of the most successful newly launched channels distributed on AT&T's platform in terms of ratings growth.  Indeed, between the first quarter of 2013 and the fourth quarter of 2014, Justice Central boasted double- to triple-digit ratings growth, as follows:

### Justice Central – AT&T U-Verse Ratings Growth

| Daypart: | Air Time: | % Growth 1st Qtr. 2013 to 4th Qtr 2014: |
|---|---|---|
| Early Fringe | 4-7 pm | +38% |
| Prime Access | 7-8 pm | +21% |
| Prime | 8-11 pm | +53% |
| Late Fringe | 11 pm-2 am | +552% |
| Overnight | 2-6 am | +295% |

47.     Despite the tremendous performance of Justice Central—and despite the national distribution of Entertainment Studios' channels on other major

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   television platforms, such as Verizon's—AT&T refuses to negotiate a carriage

2   agreement that includes payment of license fees for any of Entertainment Studios'

3   other channels (or to pay a license fee for Justice Central itself).

4       48.    In light of the proven success of Justice Central on AT&T's U-Verse—

5   and that of Entertainment Studios' other channels on competing television

6   platforms—AT&T has no legitimate, non-pretextual reason for ignoring

7   Entertainment Studios' other channels.  Yet AT&T refuses even to meet with

8   Entertainment Studios to discuss a carriage agreement for these channels.

9       49.    For over six years, Entertainment Studios has attempted to contract

10   with AT&T for carriage of one or more of its other channels for which license fees

11   would be paid, to no avail.  In fact, for almost two years, the top programming

12   official at AT&T, Slator, has refused even to meet with this 100% African

13   American–owned media company to discuss such channel carriage, even though

14   AT&T was admittedly seeing success with Justice Central, for which it pays $0 in

15   licensing fees.

16       50.    Meanwhile, AT&T entered into a channel carriage agreement with

17   white-owned/controlled RFD-TV, which provides programming focused on rural

18   and western lifestyle issues.  Not only is such programming not well tailored to

19   AT&T's largest audiences—urban viewers—but RFD-TV's programming has

20   historically had far inferior viewership as compared to Entertainment Studios'

21   channels' programming, including during key prime time viewing periods.  Based

22   on Slator's racist views, it is no surprise that AT&T contracted with RFD-TV, while

23   continuously giving Entertainment Studios the stiff-arm.

24       51.    AT&T's executives stated numerous times over the years that they do

25   not have any budget allocation for new programming costs nor any bandwidth to

26   launch any or all of the other Entertainment Studios channels that would require

27   channel carriage fees.  But in 2014 alone, AT&T launched—and pays channel

28   carriage fees for—many other networks, including SEC (Southeast Conference

Miller Barondess, llp
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000   Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

1  Network from ESPN), Root Sports Southwest (owned by DirecTV and licensed

2  after AT&T and DirecTV announced their pending merger), One America's News

3  Network, and four channels of EPIX (Epix 1, Epix 3, and Epix Drive-In, all owned

4  by Viacom).  AT&T's launch of several new networks during the same time period

5  in which they told Entertainment Studios that they lacked bandwidth to launch any

6  new networks demonstrates that their excuses for refusing to contract with

7  Entertainment Studios are pretextual.

8       52.     Moreover, AT&T does not pay Entertainment Studios a single cent to

9  license Justice Central out of its $4 billion annual channel carriage budget.  Instead,

10  AT&T actually requires Entertainment Studios to pay AT&T hundreds of thousands

11  of dollars annually.  Just as Section 1981 prohibits AT&T's racist refusal to contract

12  with 100% African American–owned media companies for channel carriage, so too

13  does it prohibit AT&T's discrimination in the terms and conditions of contracting.

14       53.     Entertainment Studios has also attempted to contract with DirecTV

15  without success.  For over six years, Entertainment Studios has asked DirecTV to

16  consider a carriage agreement for its channels—or even for a single channel—but

17  DirecTV has steadfastly refused to allow this 100% African American–owned

18  media company to participate in the $12 billion DirecTV pays annually to license

19  white owned channels.

20       54.     Instead, DirecTV, including its current head of content, York, has

21  demanded that Entertainment Studios pay the exorbitant amount of $20 million

22  annually per channel launched, which it knows Entertainment Studios does not have

23  and cannot afford to pay.  DirecTV does not demand such exorbitant payments from

24  the white-owned channels that it pays substantial license fees to distribute.  York

25  made racially motivated statements when he was the head of content at AT&T, so it

26  is no surprise that he has continued to discriminate against Entertainment Studios at

27  DirecTV.

28       55.     AT&T and DirecTV refuse to pay Entertainment Studios a single cent

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  in channel carriage license fees, though they spend approximately $16 billion

2  annually to license channels owned by white-owned media companies.

3      56.    A review of AT&T's and DirecTV's contracts and related

4  correspondence and documentation with video programming vendors through

5  discovery in this action will confirm a blatant and consistent pattern of racial

6  discrimination in contracting:  AT&T and DirecTV, collectively, pay white-owned

7  media companies approximately $16 billion in annual channel carriage license fees;

8  they pay zero dollars to 100% African American–owned media companies.

9      57.    None of AT&T's and DirecTV's various excuses for their refusal to

10  contract with Entertainment Studios are legitimate.  AT&T/DirecTV have claimed

11  that they cannot accommodate Entertainment Studios' channels due to limited

12  bandwidth and the cost of launching new channels, but these excuses are belied by

13  carriage agreements AT&T/DirecTV have entered into with similarly situated

14  white-owned channels.

15      58.    AT&T executives have admitted that AT&T and DirecTV have

16  excluded this African American–owned channel provider.  As part of their merger

17  negotiations, AT&T and DirecTV have discussed the dearth of channels produced

18  by African American–owned media companies on their respective television

19  platforms.  Following these discussions, speaking on behalf of both AT&T and

20  DirecTV, AT&T stated that it will not consider paying for Entertainment Studios'

21  television channels for any AT&T/DirecTV video platforms unless the government

22  forces AT&T/DirecTV to do business with African American–owned media

23  companies in connection with AT&T's acquisition of DirecTV.

24      59.    Thus, AT&T/DirecTV's personnel have brazenly acknowledged that

25  they will continue to refuse to pay for Entertainment Studios' channels unless

26  governmental regulators require it.  This is an admission of racial discrimination in

27  contracting and represents a deep form of institutionalized racism in violation of

28  Section 1981.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**F.      Racial Discrimination—Advertising**

60.      Other than paltry "token" payments, AT&T and DirecTV have also refused to contract with Entertainment Studios for advertising.

61.      AT&T spends approximately $4 billion a year on advertising.  DirecTV spends about $2 billion a year on advertising.  DirecTV does not spend a single dollar advertising with Entertainment Studios, while AT&T spends a trivial amount of money—approximately $200,000 out of $4 billion per year—advertising with Entertainment Studios, just so it can claim that it does business with African American–owned media companies.  This is pure tokenism.  Indeed, the paltry amount AT&T spends on advertising with Entertainment Studios does not even cover the $400,000 AT&T requires Entertainment Studios to pay AT&T for advertising.

62.      AT&T forced Entertainment Studios to overcome significant hurdles just to secure the paltry advertising dollars AT&T spends with Entertainment Studios.  Entertainment Studios met with AT&T Inc.'s former Vice President of Media Services, Chris Schembri, in Entertainment Studios' Los Angeles office.  The parties discussed Entertainment Studios request to contract with AT&T for advertising.  Schembri stated that AT&T would not advertise with Entertainment Studios unless its content appeared on primetime television—a feat that Schembri did not believe Entertainment Studios could accomplish.  AT&T intentionally set a hurdle for contracting that it did not believe Entertainment Studios would be able to achieve.

63.      Entertainment Studios overcame this obstacle.  Byron Allen convinced stations affiliated with or owned by major entertainment companies, including, among others, CBS Television Stations, Tribune Broadcasting and station affiliates of The CW network, to replace part of their weekend primetime lineup and broadcast Entertainment Studios' original sitcoms instead.  By May 2012, Entertainment Studios' sitcoms had been licensed to stations covering

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   approximately 85% of all U.S. markets.

2   64.   Despite this achievement, when Entertainment Studios approached

3   AT&T for the promised advertising dollars, AT&T would agree only to "token"

4   amounts—$100,000 annually for each sitcom that cost tens of millions of dollars to

5   produce.  AT&T kept "moving the cheese" and refused to contract in good faith

6   with 100% African-American owned media for advertising.

7   65.   Entertainment Studios has continued to attempt to contract with AT&T

8   Inc. for AT&T's vast advertising dollars, but AT&T has put up more roadblocks and

9   made more excuses.

10   66.   AT&T Inc. has told Entertainment Studios to work through AT&T's

11   advertising agency in order to obtain more advertising support.  An executive at

12   AT&T's advertising agency believes that AT&T should spend more on advertising

13   with Entertainment Studios.  He has told Entertainment Studios that he has

14   attempted to get AT&T to spend more on advertising with Entertainment Studios

15   and 100% African American–owned media, to no avail.

16   67.   After exhausting his attempts to obtain more advertising support from

17   AT&T for Entertainment Studios, the advertising agency executive organized a

18   conference call with Entertainment Studios and AT&T, Inc.'s senior advertising

19   executive, Mark Wright, Vice President of Media Services and Sponsorships.

20   During the call, Entertainment Studios addressed the issue of AT&T not doing

21   business with 100% African American-owned media.  Mr. Wright rejected

22   Entertainment Studios' request for more advertising from AT&T, in general, and, in

23   particular, in support of Entertainment Studios' annual Martin Luther King, Jr.

24   Black History Month broadcast television special celebrating African American

25   excellence.  AT&T does not observe or recognize the annual Martin Luther King, Jr.

26   national holiday, forcing its employees to use their vacation/personal days in order

27   to observe the national holiday.  Following the call, AT&T refused to change its

28   position, continuing AT&T's practice of racial discrimination in contracting for

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1 advertising dollars.

2     68.    In December 2014, Entertainment Studios again attempted to contract

3 with AT&T for advertising, this time in connection with its upcoming Black History

4 Month television special celebrating Martin Luther King, Jr.  The television special

5 features more than a dozen African-American icons, including President Obama,

6 U.S. Attorney General Eric Holder, Oprah Winfrey, Spike Lee, and Denzel

7 Washington, among others.  Again, AT&T turned Entertainment Studios away.

8 AT&T refused to spend a single cent advertising with Entertainment Studios, even

9 in connection with celebrating African American excellence.

10     69.    A review of AT&T's and DirecTV's advertising contracts, related

11 correspondence and documentation through discovery in this action will confirm

12 Defendants' pattern of racial discrimination in contracting for advertising

13 expenditures:  Of the total approximate $6 billion spent on advertising,

14 AT&T/DirecTV spend only about $200,000 a year or .00003—three ten thousandths

15 of one percent—of their total advertising budget advertising on Entertainment

16 Studios' television channels and shows.

17 **G.**    **This Lawsuit**

18     70.    This lawsuit is brought pursuant to 42 U.S.C. § 1981 of the Civil Rights

19 Act of 1866, which provides that all persons in the United States shall have the same

20 right to make and enforce contracts as is enjoyed by white persons.  Section 1981

21 prohibits racial discrimination in contracting and applies to both non-governmental

22 and governmental discrimination.

23     71.    Racial discrimination in contracting is an ongoing practice in the media

24 industry.  Racial discrimination in the media has far-reaching adverse consequences.

25 It effectively excludes 100% African American–owned media companies, African

26 American individuals, and their diverse viewpoints from the public airwaves, in

27 derogation of the public interest.  Plaintiff NAAAOM seeks to eliminate this

28 discrimination, and to obtain equality in contracting for 100% African American–

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    owned media companies.

2        72.     As alleged herein, Entertainment Studios—a member of NAAAOM—

3 is being discriminated against on account of race in violation of 42 U.S.C. § 1981.

4 Entertainment Studios thus has standing to seek redress for such violations in its

5 own right.  The interests at stake in this litigation—namely, the right of 100%

6 African American–owned media to make and enforce contracts in the same manner

7 as their white-owned counterparts—are germane to NAAAOM's purpose.  Because

8 NAAAOM seeks only injunctive relief, the individual participation of its members

9 is not required.

10        Defendants' ongoing refusal to contract with Entertainment Studios

11 constitutes unlawful racial discrimination in violation of § 1981, for which

12 Entertainment Studios seeks to recover monetary damages resulting from

13 Defendants' racial discrimination.  Plaintiffs NAAAOM and Entertainment Studios

14 also seek injunctive relief prohibiting Defendants from discriminating against 100%

15 African American–owned media companies on the basis of race in contracting for

16 channel carriage and advertising.

17        **PARTIES, JURISDICTION AND VENUE**

18        73.     Plaintiff NAAAOM is a California limited liability company, with its

19 principal place of business in Los Angeles, California.

20        74.     Plaintiff Entertainment Studios Networks, Inc. is a California

21 corporation, with its principal place of business in Los Angeles, California.

22        75.     AT&T, Inc., AT&T Services, Inc. and AT&T Mobility LLC are all

23 Delaware corporations, with their principal places of business in Texas.  AT&T also

24 has an office and operates in Los Angeles, California.

25        76.     AT&T, Inc. is the parent company of, among others, the other AT&T

26 Defendants—AT&T Services, Inc. and AT&T Mobility LLC—which report directly

27 to AT&T, Inc.  AT&T, Inc. is headed up by a fourteen-person Board of Directors,

28 including the CEO and President of AT&T, Inc., Randall Stephenson.  The Board of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   Directors is responsible for establishing corporate policies and practices and

2   reviewing AT&T's strategic business plans on all of AT&T's platforms.  The

3   President of AT&T Services reports to executives at AT&T, Inc., including Mr.

4   Stephenson.  Moreover, AT&T Inc. executives and board members, including

5   Randall L. Stephenson (Chairman and Chief Executive Officer of AT&T Inc.),

6   Joyce M. Roché (AT&T Inc. board member and Chairperson of the Human

7   Resources Committee), David S. Huntley (AT&T Inc. Chief Compliance Officer),

8   Lori Lee (AT&T Inc. Senior Executive Vice President and Global Marketing

9   Officer), and John T. Stankey (AT&T Inc. President Home Solutions and Chief

10  Strategy Officer) purposefully directed their conduct toward California by taking

11  steps to cover-up the racism of the California-based AT&T executives in charge of

12  television content and advertising sales (Daniel York and Aaron Slator).

13  77.    Moreover, AT&T's decisions regarding how to spend advertising

14  dollars are made by executives at AT&T Inc., who have met in person and had

15  telephone calls with Entertainment Studios in Los Angeles.  The racist policies and

16  practices with regard to AT&T's refusal to contract for carriage and advertising with

17  African American-owned media companies, as alleged herein, are dictated at the

18  corporate level at the direction of the parent company, AT&T, Inc., and are

19  implemented through the subsidiaries, AT&T Services, Inc. and AT&T Mobility

20  LLC.

21  78.    DirecTV, LLC is a California limited liability company, with its

22  principal place of business in El Segundo, California.

23  79.    Plaintiff is informed and believes, and on that basis alleges, that

24  Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to

25  Plaintiff for the wrongs alleged herein.  The true names and capacities, whether

26  individual, corporate, associate or otherwise, of Defendants DOES 1 through 10,

27  inclusive, are unknown to Plaintiff at this time.  Accordingly, Plaintiffs sues

28  Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  Complaint to allege their true names and capacities after they are ascertained.

2      80.   This case is brought under a federal statute, § 1981 of the Civil Rights

3  Act.  As such, there is federal question jurisdiction under 28 U.S.C. § 1331.

4      81.   Venue of this action is proper in Los Angeles because Defendants

5  reside in this district, as defined in 28 U.S.C. § 1391, and the acts in dispute were

6  committed in this district.

7                                    **FACTS**

8  **A.     AT&T's Acquisition of DirecTV**

9      83.   AT&T is a multinational telecommunications and media company.  It is

10 the second largest provider of mobile telephone and the largest provider of fixed

11 wireline telephone in the United States.  It also provides broadband internet and

12 subscription television services.  AT&T is the 16th-largest non-oil company in the

13 world.

14     84.   In May 2014, AT&T and DirecTV announced plans for AT&T to

15 acquire DirecTV for $67 billion (inclusive of assumption of debt).  The deal was

16 approved by the boards of both companies, but faces regulatory approval by the

17 Federal Communications Commission ("FCC") and the U.S. Department of Justice.

18     85.   DirecTV is currently the second largest pay TV operator in the United

19 States, serving approximately 20 million television customers.  AT&T's television

20 platform serves approximately 5.7 million subscribers.  If the acquisition is

21 approved by governmental regulators, it would create the largest pay television

22 company in the United States, with nearly 26 million subscribers.

23     86.   Post-acquisition, AT&T will control a huge percentage of the market

24 for television channel carriage.  This acquisition will result in more consolidation

25 (and thus fewer options) in the industry, especially for 100% African American–

26 owned media companies.

27     87.   Network and video programming owners and distributors like

28 Entertainment Studios, are reliant upon television distributors, like AT&T and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  DirecTV, not only to realize subscriber and advertising revenue, but also to reach

2  television consumers.  If AT&T gets bigger but continues to refuse to contract with

3  100% African American–owned media, it can and will prevent the channels owned

4  by Entertainment Studios from reaching its millions of subscribers, thus continuing

5  the exclusion of 100% African American–owned media companies and their

6  viewpoints, contrary to the public interest.

7      88.    Presently, AT&T spends approximately $4 billion in channel carriage

8  license fees each year, none of which goes to 100% African American–owned

9  media.  DirecTV spends approximately $12 billion in channel carriage license fees

10  each year, none of which goes to 100% African American–owned media.

11      89.    If AT&T's bid for DirecTV is approved, of the total $16 billion spent

12  for channel carriage by the combination of AT&T and DirecTV, none of it will be

13  paid to 100% African American–owned media.  Meanwhile, the combined

14  AT&T/DirecTV will collect billions of dollars from its television subscribers

15  annually, a substantial portion coming from African American consumers.

16      90.    Similarly, of the approximately $6 billion a year spent on television

17  advertising by AT&T and DirecTV, almost none is paid to 100% African

18  American–owned media.  But, of course, AT&T and DirecTV collect very

19  substantial revenues from African American consumers.

20      91.    There is a statistic that highlights the inequity here:  The Chairman,

21  CEO and President of AT&T, Randall Stephenson, was personally paid seven times

22  more in compensation in 2013 alone—$23 million—than all of AT&T paid to 100%

23  African American-owned–media for programming, channel carriage and advertising

24  combined during the same year.  This statistic continues for DirecTV, whose

25  Chairman, CEO and President, Michael White, was personally paid approximately

26  $13 million in 2013—again, more than DirecTV paid to 100% African American-

27  owned media for programming, channel carriage and advertising combined during

28  the same year.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

92.     The combined economic impact of Defendants' racial discrimination in contracting is significant and will serve to perpetuate the economic exclusion of 100% African American–owned media companies from American television.  By virtue of this exclusion, 100% African American–owned media is nearly extinct; and this illegal practice is self-perpetuating.  In totality, through discovery and review of AT&T and DirecTV channel carriage agreements and advertising contracts, including their related correspondence and documentation, the numbers will speak for themselves and be irrefutable.

93.     Of the approximately $22 billion AT&T and DirecTV spend annually ($16 billion in channel carriage license fees and $6 billion in advertising), only a token amount—less than $3 million (or less than 1/100th of 1 percent)—is spent annually with 100% African American–owned media.  This is an economic atrocity, illustrating the scope and magnitude of the racial discrimination in contracting by AT&T and DirecTV.

94.     Entertainment Studios is being discriminated against on account of race in connection with contracting, in violation of § 1981.  Without access to viewers and without licensing fees and advertising revenues from two of the largest video programming distributors in the country, this 100% African American–owned media business is being shut out and is being severely damaged.

**B.      Racial Discrimination In Contracting**

95.     The United States Supreme Court has held that with respect to the public airwaves, the First Amendment requires wide dissemination of information from diverse viewpoints and sources.  Indeed, one of the primary concerns with the increased consolidation of television distributors is the corresponding consolidation of sources of information.

96.     The rationale behind this First Amendment law is important: Television is among the most prevalent ways that Americans obtain information today.  Without inclusion of 100% African American–owned media, this First

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

Amendment requirement cannot be achieved.

97. Major distributors, like AT&T and DirecTV, have unique power to limit, through racial discrimination in contracting, the viewpoints available in the marketplace. Such power will be dramatically increased following AT&T's acquisition of DirecTV.

98. In many cities where Defendants have a share of the television distribution market, African Americans comprise not only a large part of the population but also account for significantly higher television viewership than other demographic groups. However, the availability of channels owned by 100% African American–owned media on Defendants' systems does not remotely reflect their subscriber base or viewership makeup.

99. None of the networks distributed and receiving licensing fees on AT&T's and DirecTV's television platforms is 100% African American owned. Although Defendants' African American subscribers pay very substantial subscriber fees, and constitute a significant advertising target for Defendants, Defendants pay nothing to 100% African American–owned media companies for channel carriage and nearly nothing for advertising (less than $3 million per year).

100. Defendants discriminate against 100% African American–owned media in favor of white-owned media. In fact, AT&T and DirecTV block entry into their television platforms for 100% African American–owned media companies by making up phony excuses about limited bandwidth and cost.

101. Entertainment Studios has been knocking on AT&T's and DirecTV's doors since 2007 seeking a carriage agreement for its suite of channels. Defendants have steadfastly refused to contract for this carriage.

102. DirecTV refuses to carry any of Entertainment Studios' channels. In fact, in response to Entertainment Studios' attempts to contract for carriage with DirecTV, DirecTV has refused and has come up with phony excuses, claiming that due to "capacity commitments," DirecTV cannot consider launching even a single

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  one of Entertainment Studios' channels unless Entertainment Studios pays DirecTV

2  $20 million per year per channel.  In other words, DirecTV refuses even to negotiate

3  with Entertainment Studios, instead reserving its channel capacity for white-owned

4  channels for which carriage fees are paid out of DirecTV's annual $12 billion

5  channel carriage budget.  Since 2012, DirecTV's refusal to contract with

6  Entertainment Studios for channel carriage has been spearheaded by DirecTV's

7  head of content, York.

8      103.   Entertainment Studios has shared the Justice Central ratings growth

9  story with DirecTV executives.  And the head of Entertainment Studios' cable

10  distribution division has followed up with DirecTV on numerous occasions to

11  secure meetings and to share empirical data and programming updates with

12  DirecTV.  In many instances, DirecTV simply ignored Entertainment Studios'

13  requests to meet.  Other times, DirecTV would respond that they had "no needs at

14  this time" or that they wanted to "hold off for a while."

15      104.   Notwithstanding its alleged "capacity commitments," DirecTV has

16  indicated that it "may" be willing to contract with Entertainment Studios if

17  Entertainment Studios agreed to pay DirecTV a substantial sum of money in

18  exchange for channel carriage.  Specifically, DirecTV demanded that Entertainment

19  Studios pay it approximately $20 million annually for DirecTV to launch just one of

20  Entertainment Studios' eight channels.

21      105.   DirecTV knows Entertainment Studios cannot afford to pay this

22  amount.  By comparison, DirecTV pays white-owned media networks

23  approximately $12 billion annually to broadcast their channels to DirecTV's 20+

24  million subscribers.  While DirecTV has been telling Entertainment Studios that

25  DirecTV lacks capacity to carry its networks, DirecTV has picked up and provided

26  channel carriage to white-owned channels, such as SEC, Cine Sony Television,

27  Back Nine, NewsMax, Hola, El Rey, Longhorn, and Filipino Channel.  This proves

28  that DirecTV's claims regarding lack of capacity to launch new channels are simply

a pretext for racial discrimination in contracting.

106.   DirecTV even refused to carry Justice Central, the first and only 100% African American–owned 24-hour court and information channel that Entertainment Studios offered to DirecTV for free (i.e., without charging channel carriage license fees).  The only way DirecTV was willing to carry the channel was for the annual payment of $20 million.  This channel has an established track record of ratings growth in key time periods and would benefit DirecTV's viewers by providing a 100% African American–owned channel and its unique voices and viewpoints—a core First Amendment obligation that is in the public interest.

107.   DirecTV's unreasonable demands are generated by its head of content, York, who has exhibited discriminatory intent in the past.  During his tenure as AT&T's head of content (2005-2012), York demonstrated racial animus toward African American–owned media companies by refusing to deal with Entertainment Studios because he claimed to have "racial cover" by virtue of a deal with Jesse Jackson.  He also discriminated against African Americans in his hiring practices, refusing to hire African American employees until he was directed to hire "diverse" or "ethnic" candidates.

108.   Likewise, AT&T discriminates in the terms and conditions of its contracts with 100% African American–owned media companies as compared to white-owned media companies, including the refusal to pay channel carriage license fees to 100% African American–owned media companies.  With regard to the single carriage contract AT&T has with Entertainment Studios to distribute Justice Central, AT&T does not pay Entertainment Studios any licensing fee, unlike similarly situated, white-owned channels.  To the contrary, AT&T requires Entertainment Studios to pay AT&T upwards of $400,000 per year to promote this single channel.

109.   Since AT&T began distributing Justice Central, the channel's ratings have skyrocketed, outperforming numerous white-owned networks AT&T pays licensing fees to broadcast on its platforms.  Despite this, AT&T refuses to pick up

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1   any of Entertainment Studios' other channels.

2       110.   As alleged above, Defendants also discriminate when it comes to

3   contracting for advertising.  Together, AT&T and DirecTV spend upwards of $6

4   billion per year on advertising.  Other than "token" amounts, however, Defendants

5   refuse to spend money contracting with 100% African American-owned media for

6   advertising.

7       111.   By this lawsuit, Entertainment Studios seeks damages as a result of

8   unlawful racial discrimination in contracting, which has severely damaged

9   Entertainment Studios' business.  Plaintiffs NAAAOM and Entertainment Studios

10  also seek injunctive relief to prohibit Defendants from engaging in such

11  discriminatory conduct in the future.

12  **C.   AT&T's Racial Animus and Cover-Up of Racial Discrimination**

13      112.   Entertainment Studios' primary point of contact at AT&T has been

14  through a senior AT&T executive (the "AT&T Executive").  Until recently, the

15  AT&T Executive's boss and the individual in charge of channel carriage agreements

16  for AT&T was Aaron Slator, President of Content and Advertising Sales.  Slator

17  was responsible for content strategy and acquisition as well as advertising sales for

18  all AT&T platforms: TV; broadband; and wireless.  Slator reported to top executives

19  at AT&T, Inc., including to AT&T Inc.'s Chairman, President, and CEO, Randall

20  Stephenson.

21      113.   As exhibited by the images found on and sent from Slator's work

22  phone (see paragraph 5, supra, and Ex. A), Slator harbors racial animus against

23  African Americans.  Slator has also discriminated against African American

24  employees on the basis of race.  Slator's overt and deep-seated racial animus, as

25  well as the racist policies and practices exhibited by Slator, have been condoned,

26  encouraged and ratified by the parent company, AT&T, Inc.

27      114.   AT&T Inc. executives and Board members became aware of the racist

28  images on Slator's company-issued phone as early as October 2013—and no later

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   than early 2014—after a former AT&T employee who worked for Slator discovered

2   the images and, on information and belief, shared them with the following:  AT&T

3   Board member and Chairperson of the Human Resources Committee, Joyce Roche;

4   AT&T's equal opportunity consultant, Stephanie Davis; and AT&T's Vice President

5   of Human Resources, Gary Fraundorfer; among others.  On information and belief,

6   Joyce Roche and/or Gary Fraundorfer shared these images with other AT&T Inc.

7   executives and Board members, including Chairman and CEO Randall Stephenson.

8       115.   On information and belief, others at AT&T were also made aware of

9   the racially offensive images on Slator's company phone, including David S.

10   Huntley (AT&T Inc. Chief Compliance Officer), Lori Lee (AT&T Inc. Senior

11   Executive Vice President and Global Marketing Officer), and John T. Stankey

12   (AT&T Inc. President Home Solutions and Chief Strategy Officer).

13       116.   AT&T and its Board covered up for Slator and enabled his racial

14   animus to continue and thrive.  AT&T paid off a former African American

15   employee who had a copy of these images in order to keep them and Slator's racism

16   under wraps.  AT&T's Human Resources department also interviewed AT&T

17   employees to determine whether any other employees had seen the offensive images

18   on Slator's phone.

19       117.   Believing it had successfully swept Slator's racism under the rug,

20   AT&T allowed Slator to continue unabated in his executive position for more than a

21   year, playing golf with CEO Stephenson and carrying on AT&T's racist practices.

22   Only after Slator's racism was publicly revealed did AT&T belatedly take action by

23   terminating Slator's employment.  AT&T acknowledged and admitted in a press

24   release that it should have taken action against Slator sooner:  "Aaron Slator has

25   been terminated.  There is no place for demeaning behavior within AT&T and *we*

26   *regret the action was not taken earlier*."

27       118.   AT&T's attempts to cover-up the racism of its high-level executives

28   continues to this day.  As alleged herein, AT&T has taken steps to discourage

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  former AT&T employees from providing testimony and evidence in support of

2  claims against AT&T relating to its institutionalized racism.

3       119.   By engaging in this cover-up, AT&T Inc. is enabling and ratifying

4  racial animus at the company.  AT&T's discriminatory intent infects its exclusion of

5  Entertainment Studios from television carriage and advertising.  Indeed, AT&T's

6  top television content and advertising sales executive, Slator, is racist against

7  African Americans.  And Slator's predecessor, York (who now holds the top

8  programming position at DirecTV) likewise harbors discriminatory animus that

9  infected his employment and carriage decisions.

10      120.   For almost two years, Entertainment Studios has unsuccessfully tried to

11  schedule a meeting with Slator, whose office is directly across the street from

12  Entertainment Studios.  But Entertainment Studios has been given various excuses

13  as to why Slator will not meet—he is too busy, does not have an assistant, etc.

14  AT&T's excuses are a pretext to avoid contracting with Entertainment Studios.  In

15  fact, Plaintiffs have recently learned that Slator and his right-hand man, the AT&T

16  Executive, have refused to take Entertainment Studios' calls—even when they are in

17  the office and available—because they don't want to speak to its African American

18  owner, Byron Allen.

19      121.   The AT&T Executive has stated to Entertainment Studios that even if a

20  meeting were to be scheduled, Entertainment Studios' President and CEO, Byron

21  Allen, an African American, should not bring up "that Black stuff" to Slator because

22  he will "go ballistic" and terminate the meeting.  Slator did not want to meet with

23  Byron Allen or hear "that Black stuff" because he harbors strong racial animus

24  against African Americans, as exhibited by the images on his phone in paragraph 5,

25  supra.

26      122.   Immediately after AT&T announced its bid to acquire DirecTV, the

27  AT&T Executive stated on a telephone call with Entertainment Studios that AT&T

28  and DirecTV know they have "a Black problem" because they are not doing

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   business with 100% African American–owned media.  The AT&T Executive made

2   this statement based on his discussions with DirecTV and was conveying concerns

3   expressed by both AT&T and DirecTV regarding potential roadblocks to their

4   merger.  On information and belief, African American employees at AT&T have

5   also overheard AT&T executives talk about this "Black problem."  AT&T/DirecTV

6   believe their "Black problem" could become an obstacle to obtaining government

7   approval of the AT&T/DirecTV acquisition.

8       123.   The AT&T Executive stated that, just after the DirecTV acquisition

9   was announced, AT&T held a call with its "lobbyists" in Washington, D.C.  The

10  AT&T Executive said that AT&T and DirecTV were "vulnerable" in Washington,

11  D.C. because they were not doing business with 100% African American–owned

12  media, and this could present a problem for approval of the acquisition.

13      124.   In an effort to deal with its "Black problem," AT&T conducted

14  research to determine which channels are truly African American owned, as

15  opposed to channels whose programming targets African American viewers but are

16  not actually owned by African Americans (e.g., BET which is owned by Viacom).

17      125.   The AT&T Executive acknowledged that the "African American

18  networks" Comcast launched following its acquisition of NBC Universal are not

19  "real" African American–owned networks, but rather networks that use token

20  African American celebrities as "fronts" for white-owned/controlled media interests.

21      126.   The AT&T Executive further told Entertainment Studios that certain

22  people thought AT&T and DirecTV should get ahead of the curve with regard to

23  their "Black problem" by contracting with 100% African American–owned

24  channels, while others thought AT&T and DirecTV should "wait and see" what the

25  FCC and/or DOJ required in connection with the approval of the AT&T/DirecTV

26  transaction.

27      127.   The AT&T Executive stated that if forced by the DOJ and/or FCC,

28  AT&T may do business with Entertainment Studios because, unlike the channels

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    launched by Comcast to obtain approval of the NBC-Universal acquisition,

2    Entertainment Studios is truly 100% African American–owned; "and it is the

3    cheapest option."

4        128.   Ultimately, AT&T stated that it would consider entering into a carriage

5    agreement with Entertainment Studios only if AT&T's and DirecTV's lack of 100%

6    African American–owned channels interferes with approval of the acquisition.

7    Otherwise, AT&T would continue to refuse to contract with Entertainment Studios

8    for its suite of channels, and would shut out Entertainment Studios from its billions

9    in channel carriage license fees and advertising expenditures.

10       129.   AT&T and DirecTV know (in their own words) that they have a "Black

11   problem."  They know they are violating the law.  But AT&T and DirecTV are not

12   genuinely interested in doing business with 100% African American–owned media

13   and have stated that they will not do so unless legally required to satisfy

14   governmental regulators.

15       130.   Very indicative of AT&T's disrespect for African Americans, AT&T

16   declined to recognize the Martin Luther King, Jr. national holiday, forcing its

17   employees either to work on the federal holiday honoring this African American

18   civil rights leader or to use a vacation day to take the day off.

19       131.   There is a blatant recent example of AT&T's unequal treatment/racial

20   discrimination: AT&T has given Peter Chernin, a prominent white businessman,

21   $500 million to produce lifestyle-related video programming on many of the same

22   subjects and genres already produced and owned by Entertainment Studios, and

23   which are available on Entertainment Studios' channels.  Thus, to avoid doing

24   business with Entertainment Studios, AT&T has invested a half billion dollars for a

25   white businessman to develop the same programming from scratch that

26   Entertainment Studios has already been producing and making available on its

27   channels for over six years, and all of which has been readily available for licensing

28   on all AT&T platforms.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

132.   This is the epitome of discrimination: Although admitting that Entertainment Studios' suite of channels is good enough for AT&T's television platform, AT&T pays a white-owned, start-up (i.e., Peter Chernin) a half billion dollars to create very similar programming and channels.

133.   By its actions and the clear-cut discriminatory animus of its President of television content, AT&T has made clear that it does not want to, and will not, contract for channel carriage with, and will not pay license fees to, Entertainment Studios—a 100% African American–owned programming provider/multi-network owner—unless the government requires it to do so.

134.   AT&T excludes Entertainment Studios in other ways as well.  While it invites white executives from white-owned media companies to its business functions, it excludes executives from Entertainment Studios.  AT&T treats entry into its television business like a "white old boys' club."

135.   Former AT&T head of programming, Dan York (currently head of programming at DirecTV), suggested AT&T had intentions to launch Entertainment Studios' other channels on a new AT&T tier with zero subscribers back in 2009/2010.  However, Mr. York was fully aware at the time that Entertainment Studios could not agree to these terms due to a "most favored nation" provision with another pay television provider larger than AT&T that did not allow for more favorable carriage terms.  If Entertainment Studios had agreed, the consequences would have been economically horrific, including an immediate negative reposition of millions of subscribers, substantial loss of license fees to the company, and eventually shuttering the cable division of Entertainment Studios.

136.   AT&T/DirecTV have used phony excuses to justify their racial discrimination in contracting.  They claim they do not have the bandwidth or capacity to accommodate Entertainment Studios' channels.  But they have entered into carriage agreements with other, similarly situated white-owned channels.

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   137.   In that regard, AT&T/DirecTV have "discovered" additional bandwidth

2   to launch networks for white-owned media, while they continue to blame lack of

3   bandwidth for refusing to contract with Entertainment Studios for carriage of its

4   channels.  Indeed, DirecTV has admitted that it could find capacity for

5   Entertainment Studios' Justice Central, but only if Entertainment Studios pays

6   DirecTV $20 million per year for carriage.  AT&T/DirecTV's bandwidth claims are

7   a pretext—a phony excuse—and evidence racial discrimination in contracting, in

8   violation of § 1981.  It is well past the time for AT&T and DirecTV to stop the

9   financial discrimination and economic genocide against 100% African American–

10   owned media.

11   **D.    "Tokenism" And Sham "Diversity Agreements"**

12   138.   The exclusion of 100% African American–owned channels from

13   distribution on major television platforms is well-recognized.  Yet, white-owned

14   media and governmental regulators have done nothing to address the inequities

15   faced by 100% African American–owned media.

16   139.   Instead, in collusion with the FCC and non-media civil rights advocacy

17   groups, the major white-owned channel distributors have concocted ways to

18   perpetuate the exclusion of truly 100% African American–owned channels.

19   140.   In particular, white-owned media companies have made monetary

20   "contributions" to various minority special interest groups in order to "buy" support.

21   This is window dressing and a deceptive, discriminatory business practice.

22   141.   They have hired former government officials—including an FCC

23   commissioner—onto their staffs; and they have entered into so-called "memoranda

24   of understanding" with non-media civil rights advocacy groups, such as the

25   NAACP, the National Urban League and Al Sharpton, who neither own nor operate

26   any channels.

27   142.   These memoranda of understanding are hypocritical shams.  In fact, the

28   "African American–owned networks" that were ultimately launched were backed

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

and controlled by white businesses, using token African American celebrities as the face of the networks.  And the networks were set up for failure, with short-term carriage agreements and minimal or no license fees.

143.   The memoranda of understanding were given the appearance of legitimacy because they were signed off by various non-media minority-interest groups and because the FCC sanctioned them.  But in effect, all they did was to enable the white-owned media companies to tout their "commitment" to racial diversity, without actually granting any 100% African American–owned media access to their nationwide television platforms.

144.   In this regard, AT&T and DirecTV have taken a page out of this deceptive playbook.  In connection with securing approval of the DirecTV transaction, instead of fixing their self-admitted "Black problem" by negotiating in good faith—and contracting—with 100% African American–owned media, AT&T is engaging in the nefarious, sham practices referenced herein.

145.   Specifically, AT&T and DirecTV are paying off non-media, so-called African American civil rights groups—such as the National Urban League and Reverend Jesse Jackson, among others—in order to "buy" their endorsement for AT&T's acquisition of DirecTV.  In fact, the AT&T Executive stated that AT&T's lobbyists had "checked in" with their "Black groups" and that AT&T was "in good shape."  In other words, the so-called Black leaders had received their "donations" and their approval had been successfully bought.

146.   AT&T and DirecTV pay these non-media civil rights groups to publicly laud the companies as "good corporate citizens."  This is hypocrisy:  In October 2014, the federal government sued AT&T for engaging in unfair and deceptive business practices for cheating their customers.  AT&T is hardly the good corporate citizen these non-media civil rights groups were paid off to proclaim and endorse.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

147.   In exchange for "donations," these non-media civil rights groups and individuals have helped to whitewash and cover-up AT&T's illegal behavior and business practices.  In fact, the National Urban League recently held a lunch in Washington D.C. endorsing AT&T and giving it an award.  AT&T's payments are designed to silence the African American community and divert attention away from Defendants' refusal to contract with 100% African American–owned media businesses (i.e., their "Black problem").

## CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1981)

### A.    Section 1981 Claim

148.   Plaintiffs refer to and incorporate by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

149.   Section 1981 of the Civil Rights Act, known as the Civil Rights Act of 1866, provides for the equality of citizens of the U.S.  It prohibits racial discrimination in, among other things, contracting.  This includes, according to the statute, "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

150.   African Americans are a protected class under § 1981.  Entertainment Studios is a 100% African American–owned media business.  To the best of Plaintiff's knowledge, Entertainment Studios is the only 100% African American–owned multi-channel provider in the United States.

151.   As alleged herein, Entertainment Studios has diligently, over many years, attempted to contract with AT&T and DirecTV to carry its channels, but they have refused.  Throughout this time, Defendants have continued to contract with— and make themselves available to contract with—similarly situated white-owned television channel providers.

152.   AT&T has also discriminated against Entertainment Studios in connection with the terms and conditions of its carriage contracts.  While AT&T

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    pays billions of dollars in channel carriage fees to white-owned channels, AT&T
2    does not spend any money to license Entertainment Studios' channels.  To the
3    contrary, AT&T requires Entertainment Studios to pay $400,000 per year for AT&T
4    to promote Justice Central on its television platform.  In this regard, too, AT&T
5    treats similarly situated white-owned television channel providers more favorably
6    than it treats 100% African American–owned media companies.

7         153.   For example, AT&T recently picked up RFD-TV, a white-owned
8    television channel focused on rural issues, such as farming and agriculture.  There is
9    less demand for this genre of channel (i.e., RFD-TV) from AT&T's subscribers—
10   many of whom are based in urban areas—than there is for Entertainment Studios'
11   channel genres.  Yet AT&T agrees to contract for carriage with—and offers
12   favorable contracting terms to—RFD-TV, while shutting out Entertainment Studios.

13        154.   AT&T and DirecTV have also contracted to carry other white-owned
14   channels while refusing to contract with Entertainment Studios for carriage of its
15   suite of channels; this evidences a discriminatory practice in violation of Section
16   1981.

17        155.   Entertainment Studios has been deprived of the right to contract, to
18   attempt to contract, or to contract on non-discriminatory terms and conditions with
19   Defendants while entities outside the protected class have been afforded these rights.
20   There are many similarly situated white-owned channels that received more
21   favorable treatment from Defendants than Entertainment Studios.

22        156.   AT&T and DirecTV have dealt with Entertainment Studios in a
23   markedly hostile manner and in a manner which a reasonable person would believe
24   is racially motivated and is discriminatory.  AT&T has refused to contract with
25   Entertainment Studios for its suite of networks; in fact, it has refused to meet with
26   Entertainment Studios' African American owner and top executive, and has even
27   refused to return his telephone calls.

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

157.   As alleged above, AT&T's head of television content, Slator, is a racist whose racial prejudices have caused him to rebuff Entertainment Studios' numerous attempts to contract with AT&T for television carriage.  What's worse, Slator's racism has been blessed by AT&T Inc.'s top executives and Board of Directors, who have engaged in a nefarious scheme to cover up the bigoted messages and images on Slator's AT&T-issued phone.

158.   DirecTV has demanded exorbitant payments from Entertainment Studios in exchange for carriage of a single channel on its television platform.

**B.**   **Damages**

159.   But for AT&T's and DirecTV's refusal to contract with Entertainment Studios, Entertainment Studios would receive approximately $328 million in annual license fees for its eight channels—calculated using a conservative license fee of fifteen cents per subscriber per month for each channel for AT&T's and DirecTV's combined 26 million subscribers.  If Defendants contracted in good faith, Entertainment Studios would also receive an estimated $100 million per year, per channel, in national advertising sales revenue, or a total of $700 million per year.

160.   Combining subscriber fees and advertising revenue, Entertainment Studios would generate approximately $1.0 billion in annual revenue from its relationship with Defendants.  Moreover, with distribution on the largest television platform in the nation, the demand for Entertainment Studios' channels would increase, leading to additional opportunities and revenue for Entertainment Studios to license its channels to other similar television distributors.

161.   Based on the revenue Entertainment Studios would generate if Defendants contracted with them in good faith, Entertainment Studios would be valued at approximately $10 billion dollars.

162.   Similarly situated lifestyle and entertainment media companies are valued at higher amounts.  But for AT&T's and DirecTV's refusal to contract with Entertainment Studios, Entertainment Studios would have a similar valuation.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

163.   Accordingly, AT&T's and DirecTV's unlawful discrimination has caused Plaintiff in excess of $10 billion in damages, according to proof at trial; plus punitive damages for intentional, oppressive and malicious racial discrimination.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment, as follows:

(1)   Plaintiff Entertainment Studios prays for compensatory, general and special damages in excess of $10 billion according to proof at trial;

(2)   Plaintiffs NAAAOM and Entertainment Studios pray for injunctive relief prohibiting defendants from discriminating against 100% African American-owned media companies, including entertainment studios, based on race in connection with contracting for carriage and advertising;

(3)   Plaintiff Entertainment Studios prays for punitive damages, based on oppression and malice, according to AT&T and DirecTV's net worth;

(4)   Plaintiff Entertainment Studios prays for attorneys' fees, costs and interest; and

(5)   Plaintiffs NAAAOM and Entertainment Studios pray for such other and further relief as the court deems just and proper.

DATED:  June 5, 2015                    MILLER BARONDESS, LLP


By: _____*/s/ Louis R. Miller*_____
      LOUIS R. MILLER
      Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury pursuant to the Seventh Amendment of the U.S. Constitution.

DATED:  June 5, 2015                    MILLER BARONDESS, LLP


                                        By:   ___*/s/ Louis R. Miller*___
                                              LOUIS R. MILLER
                                              Attorneys for Plaintiffs

257946.1

39

SECOND AMENDED COMPLAINT